UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Christopher S.,

    Plaintiff,

    v.

Commissioner of Social Security,

    Defendant.

Civil Action No. 2:23–cv–356

## OPINION AND ORDER
(Docs. 17, 18)

Plaintiff Christopher S.F. brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and remand of the decision of the Commissioner of Social Security denying his application for Supplemental Security Income (SSI). Pending before the Court are Plaintiff's motion to reverse the Commissioner's decision (Doc. 17), and the Commissioner's motion to affirm the same (Doc. 18). For the reasons stated below, Plaintiff's motion is GRANTED in part, the Commissioner's motion is DENIED, and the matter is remanded for further proceedings and a new decision.

## Background

Plaintiff was forty years old on the date he filed his SSI application. (AR 26, 204, 322.) He has a high school education and experience working as a production worker/laborer at a slaughterhouse, a chocolate factory, a cheese plant, and a pork rib factory. (AR 226, 274–85, 636, 674.) He also worked as a concrete finisher for three years until he sustained a knee injury in June 2019. (AR 636.) His longest job was for six years. (AR 674.) Since 2015, Plaintiff has worked "every day" as a caregiver for his girlfriend of over fourteen years. (AR 50; *see* AR 226–27, 274–75, 674.) He lives in a trailer park in Swanton, Vermont, with his girlfriend and their

three cats and three dogs. (AR 674.) Plaintiff had a son in 2002 and a daughter in 2006, but he has not seen his daughter since she was around three years old, and his son's maternal grandparents had custody over him when he was a minor and did not allow Plaintiff contact. (*Id.*; AR 635.) As of October 2020, Plaintiff was not able to see his son, then an adult, because he had made allegations of abuse against Plaintiff's girlfriend. (AR 635.) Plaintiff claims that his girlfriend, who has four adult children of her own (*id.*; AR 674), is "mentally abusive and excessively controlling" (AR 636).

Plaintiff suffers from bilateral knee pain, despite undergoing arthroscopic surgery on his right knee in September 2020. (AR 619.) He also suffers from chronic back pain and has been diagnosed with mild degenerative spondylosis with a loss of disc space in his lumbosacral spine. (*Id.*) Plaintiff reports multiple head injuries as a child due to abuse, general activity level, and playing sports including hockey. (*Id.*; AR 636, 674.) He thinks he suffered a traumatic brain injury in a car accident in 2002. (AR 619, 636.) Plaintiff has also been diagnosed with cervical radiculopathy (AR 683, 716, 749), which is "a disease process marked by nerve compression from herniated disc material or arthritic bone spurs," typically causing "neck and radiating arm pain or numbness, sensory deficits, or motor dysfunction in the neck and upper extremities." *Melissa C. v. Kijakazi*, No. 3:21 CV 1553(RMS), 2023 WL 154893, at *16 n.13 (D. Conn. Jan. 11, 2023) (quoting Jason David Eubanks, *Cervical Radiculopathy: Nonoperative Management of Neck Pain and Radicular Symptoms*, 81 AM. FAM. PHYS. 33 (2010)).

In addition to these physical impairments, Plaintiff also suffers from several mental impairments. Since 2010, he has carried a diagnosis of chronic severe depression. (AR 619.) He also has been diagnosed with posttraumatic stress disorder (PTSD), obsessive compulsive disorder (OCD), attention deficit hyperactivity disorder (ADHD), anxiety, panic attacks, and

anger issues. (*Id.*) In addition, Plaintiff has social phobia, and he reports that he sometimes hears

voices. (*Id.*) His anxiety often manifests as "anger outbursts." (AR 675.) The record

demonstrates that Plaintiff's PTSD is from abuse he suffered as a child. (AR 619.) Specifically,

Plaintiff has reported that his father was an abusive alcoholic and his father's friend sexually

molested Plaintiff when he was around thirteen years old. (AR 617; *see* AR 635, 674.)

According to a July 2021 medical report, Plaintiff has abused alcohol in the past,

resulting in drunk and disorderly and aggravated assault charges as well as brief jail time. (AR

674.) He underwent substance abuse and general counseling from 2010 to 2015, and in July

2021, he reported that he had not drunk heavily in well over five years. (*Id.*) In medical reports

dated October 2020 and July 2021, it is noted that Plaintiff smoked marijuana "often" (AR 674),

the earlier report specifying that he "smokes marijuana with his friends every other day" (AR

636). Plaintiff's main pleasure in life is playing with his dogs and cats. (AR 674.)

Plaintiff filed his application for SSI in April 2021 (AR 26, 87, 204), but after his

representative filed a post-hearing brief requesting the reopening of a SSI application that

Plaintiff filed on March 10, 2020, the ALJ granted the request and determined that "the time

period in question dates to March 10, 2020." (AR 26; *see* AR 322.) In his application, Plaintiff

alleges that he is unable to work due to back problems, knee problems, PTSD, ADHD, OCD,

brain injury/memory problems, severe depression, anxiety, obesity, emotional disturbance, anger

issues, and a skin condition. (AR 235.) The application was denied initially and on

reconsideration, and Plaintiff timely requested an administrative hearing. On May 3, 2022,

Administrative Law Judge (ALJ) Matthew Levin conducted a telephonic hearing on Plaintiff's

application. (AR 44–77.) Plaintiff appeared and testified, and was represented by a claimants'

representative. (AR 44, 46.) A vocational expert also testified. (AR 71–75.)

Plaintiff stated at the hearing that he spends about four hours each day doing housework, including washing dishes, vacuuming, and doing laundry. (AR 52.) He further stated that his work as a caregiver for his girlfriend entails helping her with chores like basic housekeeping, helping her pay bills, and sometimes shopping with her.[1] (AR 50.) He stated that he is paid approximately $421 per month for these caregiving services. (AR 51; *see* AR 227 (indicating Plaintiff is paid $435 per month for this job).) Although Plaintiff is able to do household chores, he stated that he has shooting pain and a pulling sensation in his neck and back when he tries to do laundry (AR 53); he cannot wash dishes without taking a break because he experiences numbness in his arms as well as back pain when standing "for a length of time" (AR 52); he can sit or stand for only about twenty minutes at a time (AR 58); reaching down or over his head with his arms causes pain (*id.*); and his hands and fingers go numb and tingly throughout the day (AR 58–59). Plaintiff stated that he engages in recommended pain management, including physical therapy (AR 61), and that he has "go[ne] through all the doctors that [his neurologist] want[ed] [him] to go through to figure out where all []his pain is coming from" (AR 56–57). But he is still "constantly" in pain (AR 61), and he feels like every doctor he sees is "there for the

_____

[1] A May 2021 Work History Report indicates that Plaintiff performed this caregiver job for *eight hours per day*, five days a week, from 2015 until the date of the Report. (AR 227.) A December 2021 Work History Report, on the other hand, indicates that Plaintiff performed this caregiver job for *ten hours per day*, seven days a week. (AR 275.) Despite both of these records, which appear to be based on Plaintiff's testimony at the hearing (*see* AR 52), the ALJ noted that Plaintiff worked as a caregiver for only about *four-and-one-half hours per day*, specifically "from approximately 7:30 a.m. to 12:00 p.m." (AR 28). Plaintiff's testimony is unclear on this point. Specifically, Plaintiff testified that he "g[o]t most of the housework and all that done" during those four-and-one-half hours each day (AR 52), not necessarily that he cared for his girlfriend during that period of time. Regarding how many hours he spent caring for his girlfriend, Plaintiff vaguely testified that he "care[d] for her every day, like, all month long." (AR 50.) But in response to a question asking, "what kind[s] of things do you find you have to do [in order to care] for [your girlfriend]," Plaintiff stated, "help[ing] her pay her bills and help[ing] her with the chores around [the house]." (*Id.*) Therefore, it appears Plaintiff considers caring for his girlfriend and paying bills/completing household chores as one in the same, and thus he may in fact spend only about four-and-one-half hours each day doing both activities combined. Reading the record as a whole, and given Plaintiff's representations in the above-described Work History Reports, there are other aspects of Plaintiff's caring for his girlfriend, although these other aspects are not specifically stated in the record. The Court has considered all the evidence in the record on this issue, but it need not resolve this factual issue to decide the pending motions.

money and not for me" (AR 64). He has chosen not to receive injections in his neck to address his spinal pain because he is uncomfortable with the idea of having a needle injected into his neck and about "end[ing] up paralyzed," and he is unsure if it would "take care of the pain." (AR 65.) Plaintiff stated that he spends most of his time indoors on his own (AR 63), largely due to his anger issues, which manifest in his "snap[ping]" at people who are "irritating [him] when [he is] trying to do something" (AR 60).

On May 17, 2022, the ALJ issued a decision finding that Plaintiff "has not been under a disability . . . [under] the Social Security Act[] since March 10, 2020." (AR 38.) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (AR 11–17.) Having exhausted his administrative remedies, Plaintiff filed the Complaint in this action on August 29, 2023. (Doc. 3.)

## ALJ Decision

The Commissioner uses a five-step sequential process to evaluate disability claims. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014). The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the ALJ finds that the claimant has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"). 20 C.F.R. §§ 404.1520(d), 416.920(d). The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment. *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's "residual functional capacity" (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her "past relevant work." 20 C.F.R. §§ 404.1520(f), 416.920(f). Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four. *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019). At step five, there is a "limited burden shift" to the Commissioner to "show that there is work in the national economy that the claimant can do." *Petrie v. Astrue*, 412 F. App'x 401, 404 (2d Cir. 2011) (internal quotation marks omitted).

Employing this sequential analysis, ALJ Levin first determined that Plaintiff had not engaged in substantial gainful activity since March 10, 2020, the application date. (AR 28.) The ALJ explained that, although Plaintiff had worked after that date as a caregiver for his girlfriend, that work activity did not rise to the level of "substantial gainful activity." (*Id.*) At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease, obesity, osteoarthritis of the knee, major depressive disorder, and PTSD. (AR 29.) In contrast, the ALJ found that Plaintiff's traumatic brain injury and related neurocognitive disorder were nonsevere. (*Id.*) At step three, the ALJ determined that none of Plaintiff's impairments, alone or in combination, met or medically equaled a listed impairment. (AR 29–30.)

The ALJ next determined that Plaintiff had the RFC to perform "light work," but with the following limitations:

[Plaintiff] can climb ramps and stairs on an unlimited basis. He can climb ladders, ropes, and scaffolds on an unlimited basis. He can frequently knee[l] and occasionally stoop and crouch. He can never crawl. [Plaintiff] can understand, remember, and carry out short and simple instructions involving one[-] to two[-]step tasks. He is able to maintain concentration, persistence, and pace while performing one[-] to two[-]step tasks for two-hour blocks of time over an eight-hour workday and 40-hour workweek. He maintains the social capacities to seek help. He can engage in occasional, defined as brief, infrequent, and non-intense, social interactions with coworkers, supervisors, and the general public. He may need help setting goals and planning, but not in a manner that rises to an accommodation.

(AR 30–31.) At step four, the ALJ found that Plaintiff was unable to perform his past work as a warehouse worker and a production worker. (AR 37.) At the fifth step, however, the ALJ found that, based on the testimony of the VE, jobs exist in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of labeler,[2] inspector/packer, and sealing-machine operator. (AR 38.) The ALJ concluded that Plaintiff had not been under a disability from the application filing date of March 10, 2020 through the date of the decision. (*Id.*)

## **Standard of Review**

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work

---

[2] The ALJ wrote "lab*or*er" in his decision, but his reference to "DOT # 920.687-126" (AR 38) indicates that he was referring to the "lab*el*er" job, which is one of the three jobs referenced by the VE at the administrative hearing (*see* AR 70). *See* DICOT 920.687-126 (G.P.O.), 1991 WL 687992 (marker II, or alternatively, labeler or stamper, job).

experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (quoting 42 U.S.C. § 405(g)); *see Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010) ("In reviewing a district court's decision upholding a decision of the Commissioner, [the appellate court] review[s] the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard." (internal quotation marks omitted)). The court's factual review of the Commissioner's decision is thus limited to determining whether "substantial evidence" in the record supports the decision. 42 U.S.C. § 405(g); *see Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004). "Substantial evidence" is "more than a mere scintilla[; i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

The substantial evidence standard is "very deferential," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (internal quotation marks omitted); *see McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F. 3d 106, 111 (2d Cir. 1998). Nonetheless, the court should bear in mind that "the Social Security Act is a remedial statute, to be broadly construed

8

2:23-cv-00356-kjd    Document 20    Filed 01/22/25    Page 9 of 28

and liberally applied," *Dixon v. Shalala*, 54 F.3d 1019, 1028 (2d Cir. 1995) (internal quotation

marks omitted), and that the court may not defer to the Commissioner's decision "[w]here an

error of law has been made that might have affected the disposition of the case," *Pollard v.

Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (alteration in original) (internal quotation marks

omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error

alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322,

328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## Analysis

Plaintiff argues that the ALJ erred in his analysis of Plaintiff's cervical radiculopathy and

in his step-five finding that Plaintiff could perform jobs requiring a reasoning level of two. (*See*

Doc. 17-1.) The Commissioner responds that the ALJ adequately considered Plaintiff's cervical

radiculopathy in conjunction with Plaintiff's other impairments, including in particular his

degenerative disc disease,[3] and did not err in finding that Plaintiff could perform the three jobs

identified by the VE at the administrative hearing. (*See* Doc. 18.) Although the record indicates

Plaintiff suffers from symptoms of cervical radiculopathy, it does not demonstrate that the

impairment restricted Plaintiff's ability to work to a greater degree than the ALJ assessed in his

---

[3] In response to Plaintiff's argument regarding the ALJ's consideration of his cervical radiculopathy, the
Commissioner argues that "when the ALJ found [that] 'degenerative disc disease' was a severe impairment at Step
2, this finding included [a finding that Plaintiff's] associated 'radiculopathy' was severe." (Doc. 18 at 6.)
Degenerative disc disease occurs "when the cushioning in [the] spine begins to wear away." Cleveland Clinic,
*Degenerative Disc Disease*, https://my.clevelandclinic.org/health/diseases/16912-degenerative-disk-disease (last
visited Dec. 10, 2024), *archived at* https://perma.cc/2WLM-TWBL. Cervical radiculopathy "occurs when a nerve in
the neck is compressed or irritated where it branches away from the spinal cord," sometimes causing "pain that
radiates into the shoulder, as well as muscle weakness and numbness that travels down the arm and into the hand."
Joshua Li, MD, PhD, Univ. of Va., *Neck & Arm Pain*, https://med.virginia.edu/joshua-li/patient-conditions/neck-
arm-pain/#:~:text=Cervical%20radiculopathy%2C%20commonly%20called%20a,arm%20and%20into%20the%20
hand (last visited Dec. 10, 2024), *archived at* https://perma.cc/2SXV-MJYX. Degenerative disc disease may cause
cervical radiculopathy. *See id.* ("Cervical radiculopathy most often arises from degenerative changes that occur in
the spine as we age or from an injury that causes a herniated, or bulging, intervertebral disk."). But the
Commissioner does not cite evidence demonstrating that *Plaintiff's* degenerative disc disease was a cause of his
cervical radiculopathy. As this argument is underdeveloped, and the Court would be required to make medical
assumptions to accept it, the Court does not consider the argument.

RFC determination. The Court finds, however, that the ALJ erred in determining that Plaintiff could perform three jobs requiring a reasoning level of two, while at the same time limiting Plaintiff to jobs requiring the performance of only one- to two-step tasks.

## I.    Plaintiff's Cervical Radiculopathy

Plaintiff claims the ALJ should have found that his cervical radiculopathy was a severe impairment and should have accounted for that impairment in his RFC determination. (*See* Doc. 17-1 at 11.) According to Plaintiff, his cervical radiculopathy causes "pain to shoot everywhere through [his] body and make [his] limbs . . . numb and tingling and burning." (AR 51.) Plaintiff also asserts that this impairment causes numbness in his arms limiting his ability to lift (AR 52), and shooting pain and a pulling sensation in his neck and back when he does certain activities (AR 53). The medical record supports a diagnosis of cervical radiculopathy and includes discussion of the symptoms arising from the impairment. (*See, e.g.*, AR 681, 683, 715, 718, 746, 749.)

### A.    Step-Two Severity Finding

It is the claimant's burden to show at step two that he has a "severe impairment," meaning an impairment that "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c); *Meadors v. Astrue*, 370 F. App'x 179, 182 (2d Cir. 2010); *see Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) ("It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so."). "[T]he standard for a finding of severity . . . is *de minimis* and is intended only to screen out the very weakest cases." *McIntyre*, 758 F.3d at 151 (citing *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995)). An impairment is "not severe" when medical evidence establishes "only a slight abnormality . . . which would have no more than a minimal effect on

[the claimant's] ability to work." SSR 85-28, 1985 WL 56856, at *3 (Jan. 1, 1985); *see* SSR 96-3P, 1996 WL 374181, at *1 (July 2, 1996) ("[A]n impairment(s) that is 'not severe' must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.").

In support of his argument that the ALJ should have found his cervical radiculopathy to be a severe impairment, Plaintiff first points to his hearing testimony where he stated that he experienced shooting pain everywhere through his body and numbness and tingling in his arms. (Doc. 17-1 at 11 (citing AR 51–54, 59).) The ALJ acknowledged this testimony in his decision but questioned Plaintiff's credibility as to the "intensity, persistence[,] and limiting effects of these symptoms" (AR 31), explaining that "[Plaintiff's] allegations of limitation are not fully persuasive[,] as they are not entirely supported by or consistent with the medical evidence of record" (AR 32). Plaintiff does not contend that the ALJ's assessment of his credibility was unsupported by the record, and indeed, this assessment "is a matter committed to the sound discretion of the ALJ, and [courts] will not identify error so long as the finding is supported by substantial evidence." *Monette v. Colvin*, 654 F. App'x 516, 519 (2d Cir. 2016) (citing *Aponte v. Sec'y, Dep't of HHS*, 728 F.2d 588, 591 (2d Cir. 1984)).

Plaintiff also argues that objective medical evidence, including a November 2021 MRI and a January 2022 nerve conduction study/EMG, demonstrates that Plaintiff's cervical radiculopathy "caused functional limitations and restrictions in his right hand and arm" and "could cause an inability to do handling activities throughout an 8[-]hour work[]day." (Doc. 17-1 at 12.) The ALJ did in fact recognize that the record includes such objective medical evidence of radiculopathy. For example, he stated that the January 2022 EMG "showed evidence of an inactive chronic right C7 radiculopathy characterized by signs of chronic reinnervation without

any active denervation." (AR 32.) Further, there is evidence that Plaintiff suffered from

symptoms of cervical radiculopathy (*see, e.g.*, AR 683 ("endure[s] numbness [and] tingling

radiating down into all [five] fingers in his right hand"), 742 (experiencing "pain . . . located in

the mid[-]neck with radiation into the bilateral arms . . . [and] into the bilateral hands"), 748

("feels like he has slightly increased difficulty holding onto [objects] secondary to sensation and

pain in his forearm"), *id.* ("Spurling's was positive for radiating neck pain to the right upper

extremity")). Nevertheless, the ALJ reasonably concluded that the medical examinations of

several consulting and treating medical sources show only mild symptoms from this impairment.

*See, e.g.*, AR 618 (September 2020 examining consultant report from Dr. Morrison noting

"[r]ange of motion of cervical spine shows full flexion, extension, and lateral rotation," and

"[h]ands have a good grip strength of 5/5 with large digits"), 683 (October 2021 treatment note

from PA Sisbarro, observing "[c]ervical spine with reasonably good range of motion," and

[patient] "denies significant pain with active range of motion at his shoulder"), 688 (January

2022 treatment note from NP Fenn stating that "pain is manageable"), 716 (December 2021

treatment note from Dr. Mauser stating that Plaintiff "feels some tightness with overhead range

of motion but can r[each] his arm overhead," "cannot reproduce his arm numbness or tingling

today and has no reproduction of his arm tingling with neck range of motion," "has full strength

with finger abduction grip wrist extension flexion biceps[,] triceps[,] and deltoids," has "[n]o

numbness or tingling," "has some degenerative changes [based on cervical spine x-rays and

MRI] . . . with some broad-based disc bulge but nothing that I can specifically correlate with his

current symptoms"), 720–21 (December 2021 treatment note from PA Sisbarro stating that

strength and range of motion of right upper extremity within normal limits, grip strength within

normal limits, "reduction of radiating symptoms into [right] hand," "absence of radiating

symptoms into [right] hand," and "reduction of radiating symptoms into [right] shoulder"), 745
(April 2022 treatment note from PA-C Weiland, noting "full [range of motion] of cervical spine"
and "[s]ensation . . . [g]rossly intact throughout all dermatomes"), 748 (January 2022 treatment
note from Dr. Hehir, noting that Plaintiff "has not noticed any difficulty with weakness in his
right hand or right arm," "denies dropping any objects," "[r]eports some slightly reduced
sensation to the fifth digit to pinprick and light touch but otherwise normal sensory examination
of the bilateral upper extremities in the major dermatomes," and has "5/5 in the bilateral shoulder
abduction, elbow flexion/extension, wrist extension/flexion, second and fifth finger abduction,
[and] thumb abduction")).

Plaintiff objects that the Commissioner's reliance on these and other portions of the
record amounts to an improper post hoc explanation for the ALJ's decision regarding his cervical
radiculopathy. (Doc. 19 at 1.) According to Plaintiff, "[w]hile the ALJ did cite some of the
medical evidence that the Commissioner cites in his brief, the ALJ did not cite the extensive and
cherry-picked medical evidence that the Commissioner now cites." (*Id.*) Plaintiff is correct that
"[a] reviewing court may not accept appellate counsel's *post hoc* rationalizations for agency
action." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (internal quotation marks omitted). A
court therefore reviews the ALJ's decision "based on the reasoning and factual findings offered
by the ALJ—not *post hoc* rationalizations that attempt to intuit what the adjudicator may have
been thinking." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1225 (9th Cir. 2009). In this
case, however, the ALJ did in fact cite many of the relevant records demonstrating Plaintiff's
diagnosis of cervical radiculopathy and alleged resulting symptoms to substantiate his RFC
determination. The ALJ also explained how he considered the reported symptoms and record
evidence in assessing Plaintiff's functional limitations:

> [D]espite his reported history of tingling and numbness in his hands, on both function reports that he completed, [Plaintiff] did not check off that he had any issue with using his hands. It is reasonable to assume that if he was experiencing daily hand tingling and numbness, he would not have failed to report this on[] two separate occasions. Additionally, while the EMG studies did document abnormalities, clinical examinations did not show any deficits in terms of grip strength, dexterity, or range of motion. [Plaintiff] also denied any history of dropping objects. The record also reflects consistent engagement in daily activities inconsistent with his current allegations of functional limitation and deficit.

(AR 33–34 (citing AR 617–20, 664–72, 738–47, 748–52).)

The ALJ also noted that Plaintiff "has declined additional treatment and . . . noted that his pain is manageable," "continues to exhibit full strength," "continues to engage in a wide range of daily activities," and "has not required any escalation in treatment or emergency care." (AR 34 (citing AR 688–700).) The ALJ further explained that "[c]linical examinations have consistently documented only mild findings, normal strength, and no manipulative deficits." (AR 34.) Therefore, while acknowledging evidence that demonstrated Plaintiff's impairments and resulting limitations, the ALJ also discussed evidence indicating that these impairments and limitations are not severely restrictive. The Court finds no error in the ALJ's efforts to reconcile the record evidence and Plaintiff's functional limitations. *See Barrere v. Saul*, 857 F. App'x 22, 24 (2d Cir. Apr. 23, 2021) ("Even though there is also evidence in the record to the contrary, and even though an analysis of the substantiality of the evidence must also include that which detracts from its weight, [the court] defer[s] to the Commissioner's resolution of conflicting evidence." (citations and internal quotation marks omitted)). To the extent that the ALJ did not specifically refer to *all* of the relevant evidence, whether or not that evidence was cited in the Commissioner's motion, he was not required to do so. *See id.* ("[T]he ALJ's failure to specifically address all of [plaintiff's] evidence is not fatal to its disability finding because the ALJ need not recite every piece of evidence that contributed to the decision, so long as the record

permits us to glean the rationale of an ALJ's decision." (internal quotation marks omitted));

*Banyai v. Berryhill*, 767 F. App'x 176, 177 (2d Cir. 2019) ("[A]n ALJ is not required to discuss

every piece of evidence submitted, and the failure to cite specific evidence does not indicate that

such evidence was not considered." (alteration in original) (internal quotation marks omitted));

*Brault*, 683 F.3d at 448 ("An ALJ does not have to state on the record every reason justifying a

decision . . . [and] is not required to discuss every piece of evidence submitted." (internal

quotation marks omitted)).

Accordingly, Plaintiff has not met his burden of showing that "no reasonable factfinder

could have reached the same conclusion as the ALJ" with respect to the severity of Plaintiff's

cervical radiculopathy. *Schillo v. Kijakazi*, 31 F.4th 64, 69 (2d Cir. 2022); *see Brault*, 683 F.3d at

448 ("The substantial evidence standard means once an ALJ finds facts, we can reject those facts

only if a reasonable factfinder would *have to conclude otherwise*." (internal quotation marks

omitted)). Even if the ALJ erred in not finding Plaintiff's cervical radiculopathy to be a severe

impairment, remand is not required because the ALJ clearly considered Plaintiff's cervical

radiculopathy when formulating his RFC. (*See* AR 31–34, 37.) An error in the step-two "severe

impairment" determination may be harmless if the ALJ considers all of the limiting effects of the

claimant's impairments in the RFC determination. *See Reices-Colon v. Astrue*, 523 F. App'x

796, 798 (2d Cir. 2013) (finding alleged step-two error harmless because ALJ considered

impairments during subsequent steps); *Stanton v. Astrue*, 370 F. App'x 231, 233, n.1 (2d Cir.

2010) (same).

## B.    RFC Determination

Furthermore, substantial evidence supports the ALJ's decision not to include any

restrictions in Plaintiff's ability to perform handling or fingering activities in his RFC

determination. According to Plaintiff, "[t]he subjective and objective evidence shows that [he] had cervical abnormalities and impairments that cause functional limitations and restrictions in his right hand and arm and which could cause an inability to do handling activities throughout an 8[-]hour work[]day." (Doc. 17-1 at 12.) However, Plaintiff does not cite any supporting evidence. The Court finds that substantial evidence supports the ALJ's finding that Plaintiff was *not* limited in his ability to do handling activities with his right hand and arm. This evidence includes both the medical records cited above (*see* AR 618, 683, 688, 715, 720–21, 745, 748), as well as evidence of Plaintiff's ability to work as a caregiver for his girlfriend every day (*see* AR 50); his ability to do housework from approximately 7:30am to 12:00pm daily, including performing basic household chores such as washing dishes, laundry, vacuuming, and food shopping (*see* AR 50, 52–53, 80–82, 250–52, 636, 674); and his ability to care for his three dogs and three cats (*see* AR 80, 250, 636, 674).

Plaintiff also contends that "[e]ven if [his] cervical radiculopathy and numbness and tingling in his right arm and hand did not totally preclude handling activities, his symptoms would clearly affect his ability to perform handling activities at a vocationally acceptable pace." (Doc. 17-1 at 12–13.) Plaintiff again does not cite evidence to support this conclusion. Although the record clearly indicates that Plaintiff experiences symptoms of cervical radiculopathy— including pain, numbness, and tingling—substantial evidence supports the ALJ's conclusion that these symptoms did not restrict Plaintiff from performing light work with the limitations designated in the ALJ's RFC determination. *See DuBois v. Comm'r of Soc. Sec.*, No. 20-CV-8422 (BCM), 2022 WL 845751, at *8 (S.D.N.Y. Mar. 21, 2022) ("To be sure, there is some evidence in the record that would support the conclusion that plaintiff had greater limitations than those the ALJ built into her RFC[; b]ut that is not the test.").

C.    **Medical Expert**

Plaintiff contends that the ALJ erroneously refused to have a medical expert review the evidence of his cervical radiculopathy. Plaintiff asserts that medical expert review was appropriate because: (1) "[Plaintiff] was unable to obtain a Medical Source Statement from the treating sources" (Doc. 17-1 at 13); and (2) the agency consultant evaluations "did not consider most of the medical records related to [Plaintiff's] cervical radiculopathy" (*id.* at 13–14). Given these alleged deficiencies, Plaintiff asserts that the ALJ's RFC finding of no manipulative limitations was improperly based on the ALJ's "own non-expert view of the raw medical information in the treatment notes." (*Id.* at 13.) This argument is not persuasive.

As an initial matter, "the ALJ's RFC conclusion need not perfectly match any single medical opinion in the record, so long as it is supported by substantial evidence." *Schillo v. Kijakazi*, 31 F.4th 64, 78 (2d Cir. 2022) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971)); *see Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) ("Although the ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he was entitled to weigh all of the evidence available to make an RFC finding that was consistent with the record as a whole.").  "An RFC finding is administrative in nature, not medical, and its determination is within the province of the ALJ." *Curry v. Comm'r of Soc. Sec.*, 855 F. App'x 46, 48 n.3 (2d Cir. 2021) (citing 20 C.F.R. § 404.1527(d)(2)); *see Schillo*, 31 F.4th at 78 (rejecting claimant's argument that, "having declined to afford controlling weight to any of the three physicians' opinions, the ALJ was thereby prohibited from making an RFC finding whatsoever"). In this case, the record contains sufficient medical findings—acknowledged by the ALJ—upon which the ALJ was able to assess that Plaintiff had no manipulative limitations due to his cervical radiculopathy. The absence of a medical source statement from a treating source

17

did not, in itself, require the ALJ to call a medical expert. *See Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013) (holding that, where medical record was "quite extensive" but "d[id] not contain formal opinions on [plaintiff's] RFC from her treating physicians," "it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing [RFC]"). As one district court recently explained:

> A medical source statement is valuable in that it affords a physician the opportunity to explicitly assess a claimant's limitations and RFC, which are necessary components of a fully developed record, but *an ALJ need not always obtain one*. Even where an ALJ does not afford controlling weight to a physician's treatment notes, a medical source statement is not required if the notes contain a comprehensive assessment of a claimant's RFC.

*Reginald R. v. Comm'r of Soc. Sec.*, 6:21-CV-06326 CJS, 2023 WL 5608869, at *10 (W.D.N.Y. Aug. 30, 2023) (emphasis added) (citation omitted) (citing *Tankisi*, 521 F. App'x at 33–34).

Moreover, Plaintiff has not identified which treating source would have provided a medical source statement supporting a finding that Plaintiff's cervical radiculopathy resulted in manipulative (or other) limitations, or what that medical source statement would say regarding those limitations. *See Joseph W. v. Kijakazi*, CASE NO. 3:23-cv-00069 (MPS), 2023 WL 11897993, at *7 (D. Conn. Dec. 15, 2023) (finding no error where the plaintiff "had not specified which providers' records were missing or what information those records would provide, and thus the [c]ourt found that the record lacked any obvious gaps requiring further development"). As the ALJ accurately noted, clinical examinations from treating sources had "consistently documented only mild findings, normal strength, and no manipulative deficits." (AR 34.) The opinions of nonexamining agency consultants Drs. Geoff Knisely and E. White support these treating source findings, and the ALJ found those opinions "persuasive." (*Id.*) Plaintiff does not

contest that finding of the ALJ, and the Court finds no reason to disturb it.[4] *See Valdes-Ocasio v. Kijakazi*, 21-3152, 2023 WL 3573761, at *2 (2d Cir. May 22, 2023) (finding it proper for ALJ to give weight to agency consultant opinion which was "generally consistent with the longitudinal evidence that [claimant's] symptoms were stable on medication"). Accordingly, the record contained sufficient information for the ALJ to determine the extent of Plaintiff's physical limitations due to cervical radiculopathy, notwithstanding the absence of a medical source statement.[5]

A medical expert (ME) is used primarily in "complex" social security cases "for explanation of medical problems in terms understandable to" the ALJ, who is not a medical professional. *Richardson v. Perales*, 402 U.S. 389, 408 (1971). The Social Security Administration's Hearings, Appeals and Litigation Law Manual (HALLEX) confirms the ALJ's discretion in the use of an ME: "The need for ME opinion evidence is generally left to the ALJ's

---

[4] Plaintiff claims that Drs. Knisely and White did not consider in their respective August 2021 and December 2021 opinions (AR 93–94, 107–08) the December 2021 treatment notes of Physician Assistant (PA) Megan Sisbarro (AR 717–22), the January 2022 treatment notes of Dr. Michael Hehir (AR 748–50), the January 2022 treatment notes of Nurse Practitioner (NP) Jennifer Fenn (AR 688–90), the February 2022 treatment notes of Dr. Nathan Mauser (AR 701–04), and the April 2022 treatment notes of PA Laura Weiland (AR 739–40) (*see* Doc. 17-1 at 14). However, none of these providers stated in the cited treatment notes or elsewhere that Plaintiff experienced disabling limitations due to his cervical radiculopathy. To the contrary, their records reflect mostly mild symptoms. For example, in October 2021, PA Sisbarro noted that Plaintiff had "reasonably good range of motion" and "denie[d] significant pain." (AR 683.) In December 2021, Dr. Mauser noted that Plaintiff had "full strength with finger abduction grip wrist extension flexion biceps[,] triceps[,] and deltoids," and had "[n]o numbness or tingling." (AR 716.) Also in December 2021, PA Sisbarro noted that Plaintiff had normal strength and range of motion of the right upper extremity, normal grip strength bilaterally, and reduction of radiating symptoms into the right hand. (AR 720.) In January 2022, NP Fenn noted that Plaintiff's pain was "manageable." (AR 688.) And in the same month, Dr. Hehir noted that Plaintiff had no weakness in his right hand or arm, denied dropping objects, and had a mostly normal sensory examination of the bilateral upper extremities. (AR 748.) Plaintiff was advised that he "w[ould] benefit from skilled [physical therapy] services to decrease radiating symptoms, decrease cervical pain, and address strength [and] [range of motion] deficits." (AR 720.) Plaintiff was also offered a cervical epidural injection and a prescription for a muscle relaxer, but he declined both treatment options. (*See* AR 659, 746.) In sum, record evidence is lacking to support the claim that Plaintiff "had cervical abnormalities and impairments that caused functional limitations and restrictions in his right hand and arm . . . which . . . cause[d] an inability to do handling activities throughout an 8[-]hour work[]day." (Doc. 17-1 at 12.)

[5] The Court further notes that Plaintiff has not cited Second Circuit authority to substantiate his claim that the ALJ erred in not calling a medical expert. (*See* Doc. 17-1 at 15–16.) The Commissioner also has not offered any authority for the contrary position. (*See* Doc. 18 at 11–14.)

discretion," HALLEX I-2-5-32(A) (last update Aug. 29, 2014), and "[t]he primary reason an

ALJ will request an ME opinion is to help the ALJ evaluate the medical evidence in a case," *id.*

at I-2-5-32(B).[6] *See Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009)

(regulations "provide discretion rather than a mandate to the ALJ to decide whether to solicit

medical expert testimony"). "When needed, use of an ME will result in a more complete record

to support the ALJ's conclusion on the ultimate issue of disability." HALLEX I-2-5-32(B).

      The ALJ explained that he denied Plaintiff's request for a medical expert because "[t]he

record contains full and sufficient documentation of [Plaintiff's] functioning, such that opinion

from an impartial medical expert is not required under the regulations." (AR 26.) The Court

agrees that the ALJ had no obligation in this case to call a medical expert to testify about

Plaintiff's limitations resulting from his cervical radiculopathy. The evidence of record was

sufficient for the ALJ to decide this issue without the aid of a medical expert. In terms of medical

opinion evidence, as noted above and in the ALJ's decision, the record contains many treatment

notes from the relevant period, coupled with the August 2021 opinion of nonexamining agency

consultant Dr. Knisely and the December 2021 opinion of nonexamining agency consultant

Dr. White. For non-medical evidence, the record demonstrates that Plaintiff's physical

---

[6] Although the Second Circuit does not appear to have addressed the issue directly, the Court recognizes that courts disagree on the proper weight accorded to HALLEX. Some courts place minimal weight on HALLEX. *See, e.g., Harper v. Comm'r of Soc. Sec.*, No. 08–CV–3803(NGG), 2010 WL 5477758, at *4 (E.D.N.Y. Dec. 30, 2010) ("[T]he HALLEX is simply a set of internal guidelines for the [Social Security Administration], not regulations promulgated by the Commissioner[;] [a] failure to follow procedures outlined in HALLEX, therefore, does not constitute legal error."); *Punch v. Barnhart*, No. 01 Civ. 3355(GWG), 2002 WL 1033543, at *18, n.3 (S.D.N.Y. May 21, 2002) ("[I]t is not clear that a violation of the procedures set forth in the HALLEX Manual is of any independent legal significance."); *Moore v. Apfel*, 216 F.3d 864, 868 (9th Cir. 2000) ("HALLEX is a purely internal manual and as such has no legal force and is not binding."). Other courts have found that HALLEX policies have at least some advisory authority. *See, e.g., Diane B. v. Comm'r of Soc. Sec.*, Civil Action No. 2:18-cv-1-jmc, 2018 WL 5024171, at *5 (D. Vt. Oct. 16, 2018) (finding that applicable HALLEX "has at least some advisory authority, given that ALJs are obliged to follow it"); *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) ("While HALLEX does not carry the authority of law, this court has held that where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." (internal quotation marks omitted)). The Court references HALLEX in this case for its general guidance on use of medical experts.

limitations have not prevented him from engaging in many activities, including working as

caregiver to his girlfriend daily; performing household chores for about four hours each day,

including cooking, cleaning, doing laundry, disposing of trash, and shopping for groceries;

mowing the lawn once a week; doing household repairs daily; handling his and his girlfriend's

finances; and caring for his three dogs and three cats. (*See* AR 33–34, 50, 52–53, 80–81, 250–52,

636, 674, 688.) Plaintiff himself stated to examining consultant Dr. Richard Morrison in

September 2020 that "the major reason he is applying for disability" is not because of any

physical impairment, but "because he has had bad depression since 2010" (AR 617); and

Dr. Morrison agreed that "most of [Plaintiff's] problems" seemed to be mental, not physical (AR

619).

Accordingly, the record supports the ALJ's finding that "[n]othing in the record suggests

that [Plaintiff] requires [physical] work-related restrictions in excess of those identified [in the

RFC determination]." (AR 34.) Plaintiff has not demonstrated that the ALJ erred in his

consideration of Plaintiff's cervical radiculopathy.

## II.    Step-Five Jobs Finding

The ALJ found at step five that Plaintiff "is capable of making a successful adjustment to

other work that exists in significant numbers in the national economy," namely, the

representative occupations of labeler, inspector/packer, and sealing-machine operator. (AR 38.)

(*See* Doc. 17-1 at 17–23; *see also* Docs. 17-2 through 17-4.) Plaintiff contends that he could not

perform these jobs because his RFC limits him to performing jobs that require no more than one-

to two-step tasks. He further asserts that each of the cited jobs requires reasoning level two,

which demands an ability to perform more than one- to two-step tasks. The Commissioner

responds that a reasoning level of two is not "*de facto* contrary to" the RFC limitation of

21

performing only one- to two-step tasks. (Doc. 18 at 16.) The Commissioner further argues that, in any event, the VE "adequately explained why a Reasoning Level of 2 was consistent with the RFC." (*Id.* at 17.)

Plaintiff is correct that the positions identified in the ALJ decision—labeler (otherwise known as marker II), inspector/hand packager, and sealing-machine operator (otherwise known as electric-sealing-machine operator)—each require a reasoning level of two. *See* DICOT 920.687-126 (G.P.O.), 1991 WL 687992 (marker II); DICOT 559.687-074 (G.P.O.), 1991 WL 683797 (inspector and hand packager); DICOT 690.685-154 (G.P.O.), 1991 WL 678535 (electric-sealing-machine operator). (*See* Doc. 17-2 at 1, Doc. 17-3 at 1, Doc. 17-4 at 1.) Plaintiff is also correct that under the caselaw, a claimant who is limited to jobs involving only "one[-] to two[-]step[] tasks," as the ALJ found here, is precluded from performing jobs requiring a reasoning level of two or higher. In *Daniel M. v. Kijakazi*, Civil Action No. 2:21-cv-243, 2023 WL 154909, at *3, n.1 (D. Vt. Jan. 11, 2023), this Court found that the argument that a reasoning level of two is not consistent with an RFC limitation to one- to two-step tasks "is well supported in the case law." More recently, the Court again recognized this principle: "Jobs demanding a Reasoning Level of Two or Three require an ability to perform more than one- to two-step tasks." *Daniel W. v. Kijakazi*, Civil Action No. 2:22-cv-88, 2023 WL 7006789, at *12 (D. Vt. Oct. 25, 2023) (citing cases); *see Windley v. Comm'r of Soc. Sec.*, 20-CV-0361 (JS), 2022 WL 17824051, at *10 (E.D.N.Y. Dec. 19, 2022) (holding that a limitation to tasks requiring no more than one- or two-step instructions "is in apparent conflict with reasoning level two"). Plaintiff's position on this issue is also supported by both (a) the Dictionary of Occupational Title (DOT)'s definition of reasoning level one to require applying "commonsense understanding to carry out simple *one- or two-step instructions*," DOT, Appendix C, 1991 WL 688702 (emphasis added);

and (b) the DOT's definition of reasoning level two to require applying "commonsense understanding to carry out *detailed but uninvolved written or oral instructions*," *id.* (emphasis added).

The Commissioner does not address the fact that the DOT's definition of reasoning level one (not two) explicitly corresponds with the ALJ's RFC determination that Plaintiff is able to carry out instructions involving only "one[-] to two[-]step tasks" (AR 30). The Commissioner also does not address the case cited above from this District or the cases from this and other Circuits holding that "there is an apparent conflict between an RFC that limits [a plaintiff] to one-to-two step instructions and [a] Reasoning [Level of] 2, which requires the ability to understand detailed instructions." *Henderson v. Colvin*, 643 F. App'x 273, 277 (4th Cir. 2016); *see Stanton v. Comm'r Soc. Sec. Admin.*, 899 F.3d 555, 559 (8th Cir. 2018) ("[T]he ALJ's limitation to one- to two-step instructions connotes that [plaintiff] cannot perform jobs that would require him to understand and carry out detailed but uninvolved written or oral instructions under Level 2 Reasoning." (internal quotation marks omitted)); *Rounds v. Comm'r Soc. Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015) ("There was an apparent conflict between [plaintiff's] RFC, which limits her to performing one- and two-step tasks, and the demands of Level Two reasoning, which requires a person to [a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions." (second alteration in original) (internal quotation marks omitted)); *McGriff v. Colvin*, No. 3:16-cv-911 (JAM), 2017 WL 3142336, at *3 (D. Conn. July 25, 2017) (holding that reasoning levels two and three are not consistent with an RFC finding of a limitation to "simple, one-to-two step tasks," as that limitation "essentially tracks the limitations for reasoning [l]evel [o]ne (the ability to [a]pply commonsense understanding to carry out simple one- or two-step instructions" (third alteration in original)

(internal quotation marks omitted)); *Santos v. Astrue*, 709 F. Supp. 2d 207, 212 (S.D.N.Y. 2010) (holding that ALJ erred in finding that claimant with RFC limitation to one- or two-step tasks could perform reasoning level two jobs).

The cases the Commissioner cites in support of its step five argument are inapposite. (*See* Doc. 18 at 16–17.) The Commissioner quotes a case from the Northern District of New York ostensibly holding that "[the] plaintiff's argument that jobs requiring a reasoning level of two exceed the ALJ's RFC determination that [the] plaintiff can perform simple, repetitive jobs that require no more than one or two tasks lacks merit." *Ridley G. v. Comm'r of Soc. Sec.*, No. 1:20-CV-773 (CFH), 2021 WL 4307507, at *11 (N.D.N.Y. Sept. 22, 2021). (*See* Doc. 18 at 16.) In the context of the full sentence from which the quotation is taken, however, *Ridley* addresses the limitation to "simple and routine" tasks, not the limitation to one- to two-step tasks:

> [P]laintiff's argument that jobs requiring a reasoning level of two exceed the ALJ's RFC determination that plaintiff can perform simple, repetitive jobs that require no more than one or two tasks lacks merit, *as courts have routinely held that a[ ] RFC determination limiting a plaintiff to **simple and routine tasks** means that a plaintiff is capable of working at reasoning development level two*.

*Ridley*, 2021 WL 4307507, at *11 (second alteration in original) (emphases added) (internal quotation marks omitted). The *Ridley* court then cites cases discussing the limitation to "simple" and "routine" work, not work requiring one- to two-step tasks. *See id.* Therefore, *Ridley* does not address the issue in this case—the limitation to one- to two-step tasks.[7] The other cases the Commissioner cites on this issue also relate to the "simple, routine" limitation and not to the "one- to two-step tasks" limitation (*see* Doc. 18 at 16–17), and therefore are similarly inapposite.

As one district court in this Circuit explained, "there is a significant and now well-acknowledged difference between an RFC limitation to 'one-to-two-step tasks' and an RFC

---

[7] As noted earlier, the ALJ's RFC determination also includes a limitation to "carry[ing] out short and simple instructions." (AR 30.)

limitation to 'short, simple instructions.'" *McGriff v. Colvin*, No. 3:16-cv-911 (JAM), 2017 WL 3142336, at *3 (D. Conn. July 25, 2017) (citing cases). Specifically, the limitation to performing only "simple" tasks, in contrast to the limitation to performing only one- to two-step tasks, does *not* conflict with a reasoning level of two. *See, e.g.*, *Laboriel v. Saul*, No. 18-CV-5294 (KPF) (OTW), 2019 WL 6831762, at *12 (S.D.N.Y. Aug. 22, 2019), *report and recommendation adopted sub nom. Laboriel v. Comm'r of Soc. Sec.*, 2019 WL 4254003 (Sept. 9, 2019) ("[W]orking at reasoning level 2 does not contradict a mandate that work be simple, routine[,] and repetitive." (internal quotation marks omitted) (citing cases)). Courts in this Circuit "routinely h[old] that an RFC determination limiting a plaintiff to simple and routine tasks means that a plaintiff is capable of working at reasoning development level two." *Patterson v. Colvin*, No. 14–CV–6224P, 2015 WL 5036934, at *16 (W.D.N.Y. Aug. 26, 2015); *see Timothy M. v. Kijakazi*, 1:20-cv-310 (BKS), 2021 WL 4307455, at *16 (N.D.N.Y. Sept. 22, 2021) ("[A] growing number of courts have held that jobs with DOT reasoning levels of two or three are compatible with limitations to simple, routine work." (internal quotation marks omitted) (citing cases)). In sum, courts take very different approaches to this issue depending on whether the claimant's limitation is to "simple" work or to performing only "one- to two-step tasks." The Commissioner's citation to cases addressing solely the limitation to simple work is thus unpersuasive.

There is clear legal support for Plaintiff's argument that a claimant who is limited to one- to two-step tasks would only be able to perform a job with a reasoning level of one. The Commissioner has not offered any authority for, and the Court has not found law to support, the position that a claimant with this limitation could perform a job with a reasoning level of two. Nonetheless, the VE testified that the jobs of labeler, inspector/packer, and sealing-machine

operator "are either at a [reasoning level of] a 1 or a 2," which "would be fine." (AR 73.) This testimony was inaccurate. None of those jobs requires a reasoning level of only one; nor do any of them require a reasoning level of "1 or 2." The DOT clearly states that all of the jobs require a reasoning level of two. *See* DICOT 920.687-126 (G.P.O.), 1991 WL 687992 (marker II, otherwise known as labeler); DICOT 559.687-074 (G.P.O.), 1991 WL 683797 (inspector and hand packager); DICOT 690.685-154 (G.P.O.), 1991 WL 678535 (electric-sealing-machine operator, otherwise known as sealing-machine operator). There is thus an apparent conflict between the VE's testimony and the DOT, which clearly limits these particular jobs to a reasoning level of two, which would not be appropriate for a person limited to performing jobs involving one- to two-step tasks.[8]

The ALJ should have addressed this apparent conflict. "[W]henever the Commissioner intends to 'rely[] on [a] [VE's] testimony,' []he must identify and inquire into all those areas 'where the expert's testimony seems to . . . conflict with the [DOT].'" *Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 92 (2d Cir. 2019) (omission and first and second alterations in original) (emphasis omitted) (quoting *Pearson v. Colvin*, 810 F.3d 204, 209 (4th Cir. 2015)); *see Gibbons v. Comm'r of Soc. Sec.*, No. 22-2730, 2023 WL 3830774, at *2 (2d Cir. June 6, 2023) ("[A]n ALJ has an independent, affirmative obligation . . . to undertake a meaningful investigatory effort to uncover apparent conflicts [between VE testimony and the DOT], beyond merely asking the [VE] if there is one." (omission in original) (internal quotation marks omitted)); *Timothy M.*, 2021 WL 4307455, at *16 ("The Second Circuit has made clear that an ALJ has an affirmative obligation to identify and resolve apparent conflicts between the DOT

---

[8] This determination by the ALJ is supported by the opinions of nonexamining agency consultants Dr. Howard Goldberg and Dr. John Petty that Plaintiff is "[m]arkedly [l]imited" in his "ability to carry out detailed instructions." (AR 95, 109.)

and VE testimony." (internal quotation marks omitted)); *Ridley G.*, 2021 WL 4307507, at *11

("Where a conflict exists between a [VE's] testimony and the [DOT], the ALJ is obligated to

identify and resolve such conflict, which requires the ALJ to obtain a reasonable explanation for

any . . . conflict between the [DOT] and a [VE's] testimony." (omission and third alteration in

original) (internal quotation marks omitted)); *see also* SSR 00-4P, 2000 WL 1898704, at *2

(S.S.A. Dec. 4, 2000) ("When there is an apparent unresolved conflict between VE . . . evidence

and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the

VE . . . evidence to support a determination or decision about whether the claimant is disabled.").

Neither the VE nor the ALJ addressed the apparent conflict between the VE's testimony

that the reasoning level of the proposed jobs "would be fine" for Plaintiff (AR 73), and the

DOT's requirement that the proposed jobs demand a reasoning level of two (*see* Docs. 17-2

through 17-4), which would not accommodate Plaintiff's limitation to performing only "one[-] to

two[-]step tasks" (AR 30). Although the VE responded to questions at the hearing regarding the

three proposed jobs (*see* AR 73), and the ALJ "determined that the [VE's] testimony is

consistent with the information contained in the [DOT]" (AR 38), neither the VE nor the ALJ

considered the particular issue presented here—whether Plaintiff could perform these reasoning

level two jobs given that he was limited to carrying out only one- to two-step tasks.

Accordingly, the ALJ did not meet his affirmative obligation to examine an apparent

conflict between the reasoning level required in the DOT for the proposed jobs and the VE's

testimony about Plaintiff's ability to perform those jobs. This omission was not harmless because

the ALJ restricted Plaintiff to work involving only "one[-] to two[-]step tasks" (AR 30),

apparently to address Plaintiff's "marked" issues with carrying out detailed instructions (AR 95,

109). The record contains no indication that the VE or ALJ believed Plaintiff's limitation to one-

to two-step tasks was insignificant or optional. In these circumstances, the Court cannot determine whether substantial evidence supports the ALJ's step-five finding. *See Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) ("[W]e may not affirm an administrative action on grounds different from those considered by the agency." (internal quotation marks omitted)). On remand, the ALJ must determine whether there is a reasonable basis to rely on the VE's testimony. Alternatively, the VE may be able to identify other jobs that require a reasoning level of one and are suitable for someone with Plaintiff's other limitations.

## Conclusion

Although the record demonstrates that Plaintiff has severe physical and mental impairments resulting in limitations in his ability to work, substantial evidence supports the ALJ's decision not to include in his RFC determination any restrictions in Plaintiff's ability to perform handling or fingering activities as a result of his cervical radiculopathy.

The ALJ erred at step five of the sequential analysis by not meaningfully addressing the conflict between the VE's testimony regarding the jobs Plaintiff could perform, the DOT's requirement that those jobs demand a reasoning level of two, and the ALJ's finding that Plaintiff could perform only one- to two-step tasks.

Accordingly, the Court GRANTS Plaintiff's motion (Doc. 17) in part, DENIES the Commissioner's motion (Doc. 18), and REMANDS for further proceedings and a new decision in accordance with this Opinion and Order.

Dated at Burlington, in the District of Vermont, this 22nd day of January 2025.

*/s/ Kevin J. Doyle*
United States Magistrate Judge